Phil G. Cooke v. Commissioner. Esther L. Cooke v. Commissioner. Estate of Allen F. Knight, Deceased, Kelly L. Knight, Executrix, and Kelly L. Knight, Individually v. Commissioner.
Cooke v. Commissioner
Docket Nos. 49322-49324.
United States Tax Court
T.C. Memo 1956-102; 1956 Tax Ct. Memo LEXIS 192; 15 T.C.M. (CCH) 514; T.C.M. (RIA) 56102; April 30, 1956
William E. Evenson, Jr., Esq., Insurance Building, Seattle, Wash., and Harry Henke, Jr., Esq., for the petitioners. Joseph G. White, Jr., Esq., for the respondent. WITHEY
Memorandum Findings of Fact and Opinion WITHEY, Judge: The following deficiencies for the calendar year 1948 have been determined by the Commissioner of Internal Revenue: Petitioner
Dkt. No.
Deficiency
Phil G. Cooke
49322
$ 165.00
Esther L. Cooke
49323
165.00
Estate of Allen F. Knight,
Deceased, Kelly L.
Knight, Executrix, and
Kelly L. Knight, Individ-
ually
49324
1,516.12
*193 The issue for our determination is the same in each case, namely, whether the respondent has erred in determining that the exchange of certain corporate stock by petitioners for stock of another corporation resulted in the recognition of capital gains realized by them on such exchange. Findings of Fact Some of the evidence has been orally stipulated upon the record. As so stipulated, it is found. The petitioners, Phil G. Cooke and Esther L. Cooke, husband and wife, are individuals residing at 3111 Marine Drive, Bellingham, Washington. The petitioner Kelly L. Knight is an individual residing at 1537 Fairview, Bellingham, Washington. Kelly L. Knight is executrix of the estate of Allen F. Knight, deceased, and by order of the Court was substituted as petitioner in the place of Allen F. Knight, deceased. Allen F. Knight and Kelly L. Knight were husband and wife at the end of the taxable year in question. The returns of all petitioners for the calendar year 1948 were filed with the collector for the district of Washington. Georgia-Pacific Plywood & Lumber Company, hereinafter referred to as Georgia, is a Georgia corporation engaged principally in the manufacture and distribution *194 of plywood, lumber and wood products in the year at issue. Its stock is widely held and is regularly traded on the New York Stock Exchange. It was not in 1948 authorized to do business in the State of Washington. From January 1948 until the following December 20, it owned 79.9 per cent of the outstanding common stock of Bellingham Plywood Corporation, a Washington corporation, hereinafter referred to as old Bellingham. Among the minority stockholders of the latter corporation were the petitioners. Petitioners Cooke, on December 22, 1948, held jointly 40 shares and petitioners Knight 150 shares. All of old Bellingham's outstanding preferred stock had been redeemed in August of 1948. In the same month, Georgia incorporated, as a Washington corporation, Bellingham Plywood Company, hereinafter referred to as new Bellingham, its capital consisting of $500. All of its stock was owned by Georgia. At the time new Bellingham was incorporated and at all times subsequent which are pertinent to this case, it was the plan of Georgia that old Bellingham be merged with Georgia; that Georgia would issue and deliver its stock to the minority stockholders of old Bellingham in conversion of the latter's *195 stock in the old corporation; that simultaneously the assets and business of old Bellingham would be transferred by Georgia to new Bellingham; that thereupon new Bellingham would be merged with Washington Veneer Company, also a Washington corporation, hereinafter designated as Washington. Washington had historically been engaged in the same business as old Bellingham and was its competitor. With minor exceptions, the stockholders of the two were entirely different. During January of 1948, Georgia acquired 50.07 per cent of the stock of Washington and retained that interest until Washington was merged with new Bellingham on December 22, 1948. These transactions were carried out on December 22, 1948. Upon the merger of old Bellingham with Georgia, each of its minority stockholders received three-fourths of one share of Georgia preferred stock and 4 shares of Georgia common stock for each share of old Bellingham stock held by them at the merger date. On the same day, the business and assets of old Bellingham acquired through merger by Georgia were transferred by it to new Bellingham, its wholly-owned subsidiary. Also, on the same date, new Bellingham was merged with Washington with *196 the latter the surviving corporation. In the latter transaction, Georgia acquired sufficient additional stock interest to bring its total stockholdings in Washington to 65,050 out of a total outstanding of 100,000 shares. The two mergers were in the consummation of written agreements between the particular corporations involved in each. The agreement in pursuance of which old Bellingham was merged with Georgia was executed on or about August 9, 1948, was ratified by the stockholders of Georgia on August 21, 1948, and by the stockholders of old Bellingham on December 20, 1948. The agreement in pursuance of which new Bellingham was merged with Washington was executed on or about August 10, 1948, was ratified by the stockholders of Washington on December 22, 1948, and by the stockholders of new Bellingham on the same date. The latter merger agreement, among other things, in its preamble included the following: "WHEREAS, an existing corporation known as Bellingham Plywood Corporation is in process of merger with Georgia-Pacific Plywood & Lumber Co., a Georgia corporation, of Augusta, Georgia, which, if consummated will result in Georgia-Pacific Plywood & Lumber Co. being the surviving *197 corporation and thus vested with all the assets, properties and business of said Bellingham Plywood Corporation, and it is now understood and contemplated that concurrent with the effective date of said proposed merger of Bellingham Plywood Corporation and Georgia-Pacific Plywood & Lumber Co. the latter, as the surviving corporation, will cause all said assets, property and business acquired from Bellingham Plywood Corporation by virtue of said mergei (subject to such liabilities and obligations subject to which the same are required to be accepted by law) will be vested in Bellingham Plywood Company, a Washington corporation and one of the constituent corporations hereto, and whereby said Bellingham Plywood Company will be a wholly owned subsidiary of said Georgia-Pacific Plywood & Lumber Co. and said Bellingham Plywood Company will then have outstanding its entire authorized capital stock of 30,000 shares of common stock of the par value of $1.00 per share; and "WHEREAS, the parties hereto desire that in the event said Bellingham Plywood Company, one of the constituent corporations, becomes vested with the assets, properties and business of said Bellingham Plywood Corporation and *198 its debts, obligations and liabilities, all substantially as the same exist on the date of this agreement, that Bellingham Plywood Company shall be merged into Washington Veneer Company in accordance with the terms and provisions of this agreement;" As of December 22, 1948, the book value of the old Bellingham assets was $3,246,334.52 and its liabilities totaled $1,534,806.59. As of December 31, 1948, the book value of the Washington assets, including the old Bellingham assets, was $8,451,566.10. Its liabilities, including the old Bellingham liabilities, totaled $1,807,634.95. The petitioners realized the following longterm capital gains upon the conversion of their old Bellingham stock to that of Georgia: Phil G. Cooke
$ 1,955
Esther L. Cooke
1,955
Allen F. Knight and Kelly L.
Knight
14,640
All of the foregoing transactions were in puruance of the plan of Georgia to merge the business and assets of old Bellingham with Washington and the acquisition by Georgia of a two-thirds majority stock interest in the latter corporation. Opinion This controversy involves the meaning of section 112 of the Internal Revenue Code of 1939, portions of which are set *199 forth in the margin. [1] Respondent has determined a deficiency based upon his finding that petitioners have realized recognizable taxable gains in the exchange of their minority stockholdings in old Bellingham for Georgia stock because Georgia was not a party to a reorganization wherein the business and assets of old Bellingham were transferred to new Bellingham, Georgia's wholly-owned subsidiary. Petitioners' position is that respondent has misconceived the extent of the reorganization; that the only reorganization of tax significance here is the merger of old Bellingham with Georgia whereby petitioners received Georgia stock in conversion of their old Bellingham stock and that the capital gain realized (stipulated to herein) was not recognizable because Georgia was the only other actual party to that transaction. *200 As we view the facts and the provisions of section 112 of the Code, both parties have misconceived the extent of the reorganization here involved. Prior to August 1948, Georgia began to consider the possibility of reorganizing the two small corporations, old Bellingham and Washington, in each of which it held a majority stock interest. Each of those corporations had historically competed in nearly every phase of their respective endeavor. The minority stockholders of each were, with a minor exception not entirely clear from this record, entirely different. Georgia did not believe it possible to obtain the necessary cooperation required by the laws of the State of Washington from these minority stockholders in order to effectuate a direct merger of one with the other. Although Georgia held the necessary two-thirds majority interest in old Bellingham to effect a stockholders' ratification of a merger agreement, it did not possess the necessary two-thirds majority of voting stock of Washington. By August of 1948, it had conceived and embarked upon a planned reorganization of the two companies, old Bellingham with Washington. To that end, in July and August 1948 and subsequently thereto, *201 Georgia made an attempt to purchase additional minority stock in each corporation. During those months, Georgia caused the following events to take place. In anticipation of its merger with old Bellingham, it incorporated new Bellingham under the laws of the State of Washington, for which it furnished the necessary $500 initial capitalization. It entered into a formal merger agreement with old Bellingham, whereby Georgia was to acquire all the business and assets of that corporation and to convert the old Bellingham minority stock into specified proportions of Georgia stock. It also entered into a formal merger agreement with Washington. On December 15, 1948, it agreed in writing to subscribe to all of the stock of new Bellingham in consideration of the transfer by it to new Bellingham of all of the business and assets of old Bellingham upon condition, however, that its (Georgia's) merger with old Bellingham become effective. Its merger agreement with Washington provided for the increased capitalization of that corporation from 70,000 to 100,000 shares and for the delivery to Georgia of the additional 30,000 shares of Washington in consideration of Georgia's transfer of the assets *202 and business of old Bellingham through new Bellingham to Washington. After litigation instituted by the minority stockholders of old Bellingham and Washington in which permanent injunctions were sought to restrain the mergers affecting each, the respective merger agreements were duly ratified by the stockholders of each corporation involved in the merger. Subsequently, on December 22, 1948, the merger of old Bellingham with Georgia became effective and old Bellingham's existence ceased, its former business and assets by virtue of Washington law became the property of Georgia and the stock of petitioners in old Bellingham became converted into shares of Georgia stock. On the same day, by bill of sale, Georgia transferred all the business and assets thus acquired from old Bellingham to new Bellingham and thereby became possessed of all the stock of that corporation. Also, on the same day, the merger agreement between new Bellingham and Washington became effective, resulting in the cessation of new Bellingham's existence, the transfer of all the business and assets originally belonging to old Bellingham to Washington, the increase of Washington's capital stock to 100,000 shares and the *203 delivery of 30,000 of such shares to Georgia. In the light of these circumstances, we can come to no other conclusion but that the reorganization referred to in section 112 consisted not in the merger of old Bellingham with Georgia, as contended by petitioners, and not in the transfer of old Bellingham's business and assets to new Bellingham, as contended by respondent, but did consist of the entire series of transactions carried out in pursuance of Georgia's plan of reorganization which ultimately resulted in the transfer of that business and its assets from old Bellingham to Washington. We must next determine then whether or not Georgia was, within the meaning of section 112(b)(3), a party to such reorganization because, under that section, unless it was, petitioners' capital gains realized through their acquisition of Georgia stock are recognized and taxable pro tanto. On the authority of Groman v. Commissioner, 302 U.S. 82, and Helvering v. Bashford, 302 U.S. 454, the transfer of old Bellingham's assets to new Bellingham, whereby petitioners received stock of Georgia, resulted in the recognition of capital gains thereby realized. On the authority *204 of Anheuser-Busch, Inc., 40 B.T.A. 1100, affd. (C.A. 8) 115 Fed. (2d) 662, certiorari denied 312 U.S. 699, it is clear that the acquisition by Georgia and new Bellingham of old Bellingham's assets and their simultaneous transfer by new Bellingham to Washington does not alter the effect of these statutory provisions as the plan of reorganization did not envisage more than a transitory holding of those assets by either Georgia or new Bellingham. See Robert Campbell, 15 T.C. 312. We must conclude that Georgia, even though it temporarily held the business and assets of old Bellingham in their transition to Washington, acted as a mere conduit and was not, therefore, within the meaning of that section, a party to the reorganization. It follows that the capital gains realized by petitioners, stipulated to herein and found as a fact, were recognized capital gains as of the date of the conversion of petitioners' old Bellingham stock to that of Georgia. Decisions will be entered under Rule 50. Footnotes
1. SEC. 112. RECOGNITION OF GAIN OR LOSS. (a) General Rule. - Upon the sale or exchange of property the entire amount of the gain or loss, determined under section 111, shall be recognized, except as hereinafter provided in this section. (b) Exchanges Solely in Kind. - * * *
(3) Stock for stock on reorganization. - No gain or loss shall be recognized if stock or securities in a corporation a party to a reorganization are. in pursuance of the plan of reorganization, exchanged solely for stock or securities in such corporation or in another corporation a party to the reorganization. * * *
(g) Definition of Reorganization. - As used in this section (other than subsection (b)(10) and subsection (1)) and in section 113 (other than subsection (a)(22)) - (1) The term "reorganization" means (A) a statutory merger or consolidation, or (B) the acquisition by one corporation, in exchange solely for all or a part of its voting stock, of at least 80 per centum of the voting stock and at least 80 per centum of the total number of shares of all other classes of stock of another corporation, or (C) the acquisition by one corporation, in exchange solely for all or a part of its voting stock, of substantially all the properties of another corporation, but in determining whether the exchange is solely for voting stock the assumption by the acquiring corporation of a liability of the other, or the fact that property acquired is subject to a liability, shall be disregarded, or (D) a transfer by a corporation of all or a part of its assets to another corporation if immediately after the transfer the transferor or its shareholders or both are in control of the corporation to which the assets are transferred, or (E) a recapitalization. or (F) a mere change in identity, form, or place of organization, however effected. (2) The term "a party to a reorganization" includes a corporation resulting from a reorganization and includes both corporations in the case of a reorganization resulting from the acquisition by one corporation of stock or properties of another.↩